Justice Beth Baker delivered the Opinion of the Court.
***502 ¶1 The Ninth Judicial District Court, Toole County, granted summary judgment in favor of ROC Gathering, LLP, Ranck Oil Company, Inc., and Commercial Energy of Montana, Inc., (collectively, "ROC" or "Defendants") after determining that those parties had not breached their contract with Ferdig Oil Co., Inc. and Somont Oil Company, Inc. (collectively, "Ferdig Oil"). The District Court entered a separate order awarding ROC attorney fees and costs in the action. Ferdig Oil appeals both orders. We consider the following issues on appeal:
1. Whether the District Court properly held on summary judgment that ROC did not breach or repudiate the parties' 2006 Settlement Agreement;
2. Whether the District Court abused its discretion in fixing the amount of attorney fees and costs to which ROC was entitled as the prevailing party.
We affirm the summary judgment order and reverse for modification ***503 of the fees and costs.
PROCEDURAL AND FACTUAL BACKGROUND
¶2 The parties to this case are engaged in the business of gathering, processing, and marketing oil and natural gas in northern Toole County, Montana. Barbara Ranck Perry and Ron Perry have ownership interests in each of the three Appellees: ROC Gathering, Ranck Oil, and Commercial Energy. Charles Jansky owns Appellants: Ferdig Oil and Somont Oil. All five companies were signatories to a Settlement Agreement in 2006 ("2006 Agreement") to resolve multiple commercial disputes arising from their various business relationships. At issue in this case is the provision of the 2006 Agreement that allowed Ferdig Oil to tap into a delivery line owned and operated by ROC Gathering.
¶3 The delivery line at issue runs from ROC Gathering's natural gas processing facility near Oilmont, Montana (the "Oilmont Plant") to Northwestern Energy's transmission system. Ferdig Oil owns a nearby plant (the "Morton Plant") that processes natural gas containing hydrogen sulfide, called "sour gas." Per the 2006 Agreement, Ferdig Oil paid for the construction of a pipeline from its Morton Plant directly to ROC Gathering's delivery line. The interconnection of this pipeline from the Morton Plant into ROC Gathering's delivery line is physically located in a locked meter house on ROC Gathering's property, along with a block valve that can close the interconnection. Ferdig Oil does not have access to the interconnection or block valve without a ROC Gathering employee unlocking the meter house for it.
¶4 Ferdig Oil began using the interconnection into ROC Gathering's delivery line in April 2008. Ferdig Oil shut down the Morton Plant on a number of occasions over the years for maintenance or repairs. The block valve would be closed during these occasions, but Ferdig Oil otherwise consistently used the interconnection until 2014.
¶5 On September 30, 2010, counsel for ROC Gathering sent Ferdig Oil a notice of termination, stating that it was terminating Ferdig Oil's right to tap into ROC Gathering's delivery line because Ferdig Oil had breached its obligations under the agreement by allowing sour gas into the pipeline. ROC
*121 Gathering took no steps to close Ferdig Oil's interconnection at that time, however, and Ferdig Oil continued using the tap. In July 2012, Ferdig Oil filed a declaratory action against ROC seeking to determine its rights under the 2006 Agreement and injunctive relief to enjoin ROC Gathering from disabling the tap in the future. Ferdig Oil did not prosecute or serve the Defendants with the suit immediately.
***504 ¶6 Ferdig Oil shut down the Morton Plant in early January 2014 for repairs to its reboiler. ROC Gathering closed the block valve to allow for the repairs. While repairs on the Morton Plant were ongoing, Ferdig Oil served each Defendant with the suit it had filed in 2012. The Defendants answered and brought counterclaims in May 2014.
¶7 On July 9, 2014, Jansky e-mailed Ranck Perry that Ferdig Oil had completed reboiler repairs at the Morton Plant, but explained, "[W]e noted a leak in our delivery line, which we are in the process of repairing with a replacement line. And so at this point we are still shut down, hoping to be back up shortly." On July 14, Joe Alborano, an employee at Ferdig Oil, e-mailed Ranck Perry informing her that Ferdig Oil had "a bad sales gas line from the Morton plant over to the old meter shack at your plant" and would "need to dig back from the shack 100 feet or so to tie into" a replacement line. He asked whether an employee from ROC Gathering would be available to unlock the meter house for Ferdig Oil to complete the work. Ranck Perry replied that, because of the pending legal action, she had forwarded the request to ROC Gathering's legal team. She denied Ferdig Oil access to ROC Gathering's property in the interim. While waiting for a response from ROC Gathering's legal team, Ferdig Oil abandoned its plan to tie into a replacement line, because it isolated a leak in the original pipeline on its own property. It repaired the leak by replacing a section of the original pipeline. Ferdig Oil informed ROC Gathering that it had repaired the pipeline.
¶8 After discussions between the parties' lawyers, ROC Gathering's counsel sent an e-mail to Ferdig Oil's counsel on July 24, 2014. In the e-mail, ROC Gathering requested verification that the leak in Ferdig Oil's line had been fixed. ROC Gathering's counsel wrote, "We are not at all comfortable that the sole source of the leak has been discovered or that the system is safe to start operations." It requested details of the repairs, including information about who had repaired the pipeline and how it was done. ROC Gathering stated it wanted to inspect the pipeline and have appropriate pressure testing done or to review any data if Ferdig Oil already had completed testing the pipeline. The e-mail explained that
apart from the issues in the pending litigation, we are too concerned about the risk of a continuing leak and potential explosion to agree to let Ferdig simply open the tap and start producing, but we are willing to work with you to determine that your system is safe to re-start.
¶9 The second paragraph of the e-mail turned to the ongoing litigation between the parties, reiterating ROC Gathering's position ***505 that the 2006 Agreement between the parties was terminated or terminable and that Ferdig Oil's operations were a proper basis for termination. ROC Gathering's counsel sought a non-waiver, non-admissibility agreement to prevent Ferdig Oil from using continued production against ROC Gathering in the litigation. After proposing the non-waiver, non-admissibility agreement, counsel explained that ROC Gathering was "not saying no" to Ferdig Oil's requests to open the tap. As an alternative to the non-waiver, non-admissibility agreement, counsel proposed that the parties attempt to negotiate a global resolution of all of the parties' outstanding issues rather than work through the issues piecemeal. In concluding the e-mail, ROC Gathering's counsel asked for Ferdig Oil's thoughts on the ideas it proposed.
¶10 Ferdig Oil did not respond to the July 24 e-mail, but filed an application for a preliminary injunction to order ROC Gathering to reopen the tap. The District Court denied the application. After the denial, Ferdig Oil developed its own direct line to Northwestern Energy's transmission system and filed an amended complaint asserting claims for monetary damages for breach of contract; anticipatory breach; breach of implied duty of good faith and fair dealing; constructive *122 fraud and negligent misrepresentation; intentional interference with contract rights; and unjust enrichment. Ferdig Oil sought over $6 million in damages.
¶11 ROC filed for summary judgment, arguing that they had not interfered with or breached the 2006 Agreement. Alternatively, they argued that Ferdig Oil and Somont Oil had failed to mitigate their damages when they developed their own delivery line to Northwestern Energy's transmission system without responding to the July 24 e-mail. Ranck Oil and Commercial Energy sought summary judgment on the additional ground that they were improperly joined, asserting that the rights and obligations at issue were solely between ROC Gathering and Ferdig Oil. The District Court agreed with ROC and granted summary judgment to all Defendants.
STANDARDS OF REVIEW
¶12 We review a district court's grant of summary judgment de novo. Boulder Hydro Ltd. P'ship v. Nw. Corp. , 2018 MT 248, ¶ 8, 393 Mont. 85, 428 P.3d 250. A moving party is entitled to summary judgment under M. R. Civ. P. 56(c)(3) when the party demonstrates the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. Boulder Hydro , ¶ 8. The interpretation of a contract is a question of law we review for correctness.
***506 Boulder Hydro , ¶ 8. The determination of whether a party materially breached a contract is a question of fact. Eschenbacher v. Anderson , 2001 MT 206, ¶ 22, 306 Mont. 321, 34 P.3d 87. We review a district court's findings of fact for clear error. Eschenbacher , ¶ 22.
¶13 Where legal authority exists to award attorney fees, we review a trial court's award of attorney fees and costs for an abuse of discretion. See Houden v. Todd , 2014 MT 113, ¶¶ 20-21, 375 Mont. 1, 324 P.3d 1157.
DISCUSSION
¶14 1. Whether the District Court properly held on summary judgment that ROC did not breach or repudiate the parties' 2006 Settlement Agreement.
¶15 Ferdig Oil challenges the District Court's order granting summary judgment in favor of ROC. Ferdig Oil maintains that ROC Gathering's July 24 e-mail conditioned Ferdig Oil's continued use of the pipeline interconnection on acceptance of and compliance with new terms that were not contained in the original 2006 Agreement. Ferdig Oil argues that this constitutes breach, repudiation, or anticipatory breach. Ferdig argues that the safety assurances ROC Gathering sought were related to repair work that did not occur on ROC Gathering's property and that it was not reasonable for ROC Gathering to demand assurances about repair work on Ferdig Oil's own property. Ferdig Oil cites this Court's determination in Eschenbacher that a defendant's demands for additional information to allay safety concerns constituted a breach of contract because the plaintiff had no contractual obligation to provide such information. Ferdig Oil argues that it had no obligation to provide ROC Gathering with the safety verification it requested because the 2006 Agreement did not require Ferdig Oil to provide such verification. Ferdig Oil emphasizes that ROC Gathering not only requested safety assurances, but also conditioned continued use of the interconnection on the execution of either a non-waiver, non-admissibility agreement or a global settlement.
¶16 Ferdig Oil's reliance on Eschenbacher is misplaced. In that case, the contract was for the sale and delivery of a log home. Eschenbacher , ¶ 7. The contract required the defendant to deliver the log home to the building site and the plaintiff to arrange for a boom truck to assemble it. Eschenbacher , ¶ 29. It provided that the plaintiff would be responsible for any costs that the defendant incurred if the allotted time for the defendant's transportation truck was exceeded. Eschenbacher , ¶ 27. We held that the defendant breached the contract ***507 by refusing to deliver the home until the plaintiff provided him with information about the hired boom truck. Eschenbacher , ¶ 27. The defendant argued that he needed the information to ensure the plaintiff had hired an adequate boom truck in order to perform under the contract safely. Eschenbacher , ¶ 26. We determined *123 that the contract required the defendant to deliver the home to the site and that he was not entitled to additional information about the boom truck before delivery. Eschenbacher , ¶ 29. As the drafter of the contract, the defendant could have included specific requirements for the boom truck in the contract, but he did not. Eschenbacher , ¶ 29. We explained, however, that the defendant could have refused to unload the truck had the boom truck been inadequate when he arrived. Eschenbacher , ¶ 27. The contract provided that the plaintiff would have been liable for any expenses the defendant incurred while waiting for proper equipment to arrive. Eschenbacher , ¶ 29.
¶17 In the present case, the block valve on the interconnection had been closed for months while the Morton Plant underwent repairs. Ferdig Oil informed ROC Gathering in two separate e-mails that the line leading to the interconnection was bad and Ferdig Oil was planning to tie into a replacement line. After ROC Gathering requested that Ferdig Oil work through its attorneys for access to the property to tie into the replacement line, Ferdig Oil informed ROC Gathering that it had fixed the original line. The July 24 e-mail sought verification that the safety issues had been resolved. Ferdig Oil never responded to the request for verification. ROC Gathering did not breach the 2006 Agreement by requesting verification that a leak in Ferdig Oil's line would not expose ROC Gathering, its personnel, or others present on its property to risk of injury. Just as the defendant in Eschenbacher would not have been required to allow an inadequate boom truck to unload the log home once it arrived at the building site, ROC Gathering was not required to open up a previously leaking pipeline without verification that the leak was repaired.
¶18 Ferdig Oil also maintains that the second paragraph of the July 24 e-mail conditioned use of the pipeline on the execution of new agreements. Ferdig Oil focuses on isolated portions of the July 24 e-mail to argue that they demand new terms to the agreement. Read in its entirety and in context, however, the second paragraph of the e-mail is a request for discussion, not "an unequivocal statement that the demanding party will not perform unless the other party meets the additional term." Eschenbacher , ¶ 38.
¶19 In September 2010, ROC Gathering gave Ferdig Oil notice that ROC Gathering intended to terminate the 2006 Agreement at the end ***508 of that year, due to alleged shutdowns of the delivery pipeline caused by sour gas from Ferdig Oil's facility. Ferdig Oil filed suit against ROC in July 2012, alleging that ROC threatened to disconnect Ferdig Oil's tap into the delivery line without authority to do so and seeking a declaration that Ferdig Oil had a right to maintain its tap pursuant to the express terms of the 2006 Agreement. Ferdig Oil served this complaint on ROC while the tap still was closed for repair work at the Morton Plant. ROC's answer alleged that Ferdig Oil had breached the agreement by souring the Oilmont Plant and by not maintaining its facility and equipment in a properly safe condition. ROC also asserted a counterclaim seeking a declaratory ruling that it had the right to terminate the 2006 Agreement after a reasonable time and upon reasonable notice, and that it properly had done so. Thus, on July 24, 2014, the parties were engaged in active litigation and the status quo was that Ferdig Oil's interconnection into the delivery line had been closed for almost seven months.
¶20 The e-mail must be read in the context of the parties' litigation posture at the time it was written: the July 24 e-mail was an attempt by ROC to discuss Ferdig Oil's continued use of a closed delivery line in the context of ongoing and active litigation-litigation in which ROC claimed that Ferdig Oil already had breached the contract and that ROC already properly had terminated the contract-or to begin negotiations to resolve the lawsuit. Under these circumstances, there is nothing wrong with a party refusing to undermine its own litigation posture. The second paragraph opens by stating: "Assuming we can get past [the safety issues], we still have the concern that agreeing to open the taps and resume production prejudices the defendants' rights in the lawsuit. We claim that the contract is properly terminated and/or terminable." In fact, ROC filed a motion for partial summary judgment to resolve *124 that issue in May 2015, which the District Court granted. Ferdig Oil does not appeal this order. In its proper context, it is clear that the second paragraph of the July 24 e-mail sought to protect ROC's litigation positions and requested settlement negotiations in relation to the ongoing litigation. Such a request does not constitute breach of the contract that is the subject of the dispute.
¶21 Ferdig Oil also challenges the District Court's determination that Ferdig Oil did not attempt to mitigate its damages and that Ranck Oil and Commercial Energy were misjoined in the proceedings. We need not address these arguments, however, because we affirm the District Court's decision to grant summary judgment on the ground that ROC did not breach the 2006 Agreement.
¶22 2. Whether the District Court abused its discretion in fixing the ***509 amount of attorney fees and costs to which ROC was entitled as the prevailing party.
¶23 The 2006 Agreement included a provision entitling the prevailing party to recover attorney fees and costs. The 2006 Agreement states:
In the event any party to this Agreement is compelled to incur any expenses, including reasonable attorney's fees, in instituting or prosecuting any action, suit or proceeding to enforce any of the terms, covenants or conditions contained herein, or to collect damages, the prevailing party in any such action, suit or proceeding shall be entitled to recovery of such attorney's fees and all court costs incurred therein.
Ferdig Oil challenges the amount-over $465,000-that the District Court awarded to ROC under this provision. Ferdig Oil challenges the award of fees for redundant and excessive time, the reasonableness of the hourly fee rate, and the award of fees generated in establishing the amount of the fee award. Ferdig Oil also challenges the amount of costs awarded, arguing that the District Court abused its discretion in awarding costs not allowed under § 25-10-201, MCA. Finally, Ferdig Oil challenges the allocation of fees and costs between the three Appellees.
¶24 If attorney fees are recoverable by statute or contract, an award of fees must be reasonable. Houden , ¶ 37. Whether an award of attorney fees is reasonable depends on the facts of each case. Houden , ¶ 37. Although the trial court may consider additional factors when determining what constitutes a reasonable attorney fee award, the court should consider: "(1) the amount and character of the services rendered; (2) the labor, time and trouble involved; (3) the character and importance of the litigation in which the services were rendered; (4) the amount of money or the value of the property to be affected; (5) the professional skill and experience called for; (6) the attorneys' character and standing in their profession; and (7) the results secured by the services of the attorneys." Houden , ¶ 37 (quoting Plath v. Schonrock , 2003 MT 21, ¶ 36, 314 Mont. 101, 64 P.3d 984 ). The court's determination of the fee award must be based on competent evidence. Plath , ¶ 39.
¶25 Ferdig Oil maintains that the District Court's award was not reasonable and that the court abused its discretion because it included redundant or excessive hours in the fee award. Ferdig Oil relies on the testimony of its expert Marc Buyske, who opined that some hours billed by ROC's counsel were duplicative, redundant, and excessive. Buyske questioned the hours that ROC's new counsel billed when they first took over the case as repetitious of work that prior counsel had ***510 completed and questioned the hours that ROC's counsel billed when two attorneys were working simultaneously on the case.
¶26 ROC's counsel submitted an affidavit to rebut Buyske's opinions, explaining that counsel's hours were not redundant or excessive, because his firm pursued a different litigation strategy than had the prior firm-namely, they focused on issues that could be resolved in summary judgment, rather than at trial-conducted depositions, and submitted and objected to motions in limine regarding Ferdig Oil's claimed damages. Further, he explained the division of labor between the two attorneys working on the case and that the hours they each spent on the case were not redundant. The District Court explained in its oral ruling at the hearing that *125 the number of hours billed were reasonable because of ROC's prior experience with Ferdig Oil and its aggressive litigation strategies. Further, the sheer volume of discovery (roughly 60,000 pages) in this case and vagueness of the claims justified the number of hours spent on the case. The District Court thoroughly explained its reasoning for allowing the claimed hours, and its decision is supported by substantial evidence in the record. We will not substitute our judgment for that of the District Court in determining the number of hours billed to be reasonable.
¶27 Ferdig Oil also argues that the District Court abused its discretion in allowing recovery for the full hourly rate charged by ROC's counsel. Buyske testified that the hourly rate charged by ROC's counsel was unreasonable, because the legal issues in the case were not complicated and could have been handled by an attorney in Montana at a lower rate. He opined that based on an informal survey he had taken of rates charged by attorneys in Montana, an appropriate hourly rate was $200-one-third of the rate charged by ROC's counsel.
¶28 In awarding fees at the full hourly rate, the District Court relied on the factors discussed in Plath . The District Court found that ROC's counsel had a strong reputation and their character in the profession was good. Further, counsel achieved successful results. The court reasoned that the character of the litigation was serious and ROC had to litigate thoroughly because Ferdig Oil had indicated repeatedly that it would not settle any issues, but rather sought to litigate every issue fully and bring the case to trial. The District Court acknowledged that the case did not raise unique or innovative issues of law and the legal issues raised were not complicated. The court emphasized, however, that the voluminous discovery in this case required a special expertise that small firms would not be able to handle. The court also emphasized that the damages claimed were significant and included claims for $6 million in quantified damages, along with claims for ***511 various unquantified damages, including loss of leases, loss of experienced employees, and lost revenue. Given these circumstances, the District Court determined that ROC acted reasonably in hiring an experienced, out-of-state law firm that charged considerably higher hourly rates.
¶29 Ferdig Oil relies on Ihler v. Chisholm , 2000 MT 37, ¶ 35, 298 Mont. 254, 995 P.2d 439, and Tacke v. Energy West, Inc. , 2010 MT 39, ¶ 32, 355 Mont. 243, 227 P.3d 601, to argue that the Defendants were required to prove that the legal services required by their case were not readily available at a lower charge or rate in the area where the services are to be performed. Both cases, however, involved the award of attorney fees under statutes specifying fee awards based on hourly rates in the relevant community. Ihler , ¶ 27, Tacke , ¶ 32. The attorney fees in this case were not awarded under statute, but under the provisions of the contract between the two parties. Ferdig Oil cites no authority requiring district courts evaluating a contractual claim for fees to consider whether the legal services required by the case were readily available at a lower charge or rate in the area. In such cases, the district court considers the seven Plath factors, along with other relevant considerations. The Plath factors serve as a guideline for district courts to determine reasonable attorney fees, but the factors are non-exclusive. District courts should, however, consider the surrounding facts and circumstances of each case in determining a reasonable attorney fee. We review the district court's award of attorney fees for an abuse of discretion. Under this standard, we will not substitute our judgment for the district court's judgment unless "it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice." Houden , ¶ 20 (internal quotations omitted). The district court is in the best position to determine an appropriate attorney fee award.
¶30 Considering each of the Plath factors, the District Court determined that ROC had acted reasonably in preparing for the case given its experience litigating against Ferdig Oil previously, the amount of and complicated nature of the damages sought, and the voluminous discovery produced. The attorney fee award in this case is eye-popping by Montana standards for a breach of contract *126 case, totaling almost a half-million dollars. Absent an abuse of discretion, however, we cannot substitute our judgment for that of the District Court. After scouring the record, we conclude that Ferdig Oil has not shown the District Court's award to be arbitrary and without employment of conscientious judgment, or that it exceeded the bounds ***512 of reason under the circumstances. Although it would not have been an abuse of discretion for the court to reduce the hourly rate awarded, the District Court did not abuse its discretion to award the full hourly rate requested.
¶31 Ferdig Oil next contends that the District Court erred in awarding the fees generated in determining the amount of fees, or "fees for fees." Ferdig Oil relies on Chase v. Bearpaw Ranch Association , 2006 MT 67, ¶ 25, 331 Mont. 421, 133 P.3d 190, and Houden , ¶¶ 41-42.
¶32 A general contract provision shifting attorney fees does not authorize an award of fees for time spent in seeking the fees themselves. Houden , ¶ 41. Determining whether a contract provision allows for the recovery of fees generated in determining the amount of the fee award is necessarily a question of contract interpretation. See Chase , ¶ 29. In Chase , we determined that a fee-shifting provision that provided for the recovery of attorney fees "in any action of any kind for the enforcement of" the terms of the contract, did not allow for the recovery of fees incurred in the establishing the amount of reasonable attorney fees. Chase , ¶¶ 31-32. We held that litigation to determine the amount of fees, unlike litigation to determine entitlement to fees, was not an action to enforce the terms of the contract. Chase , ¶ 32. In contrast, in Blue Ridge Homes, Inc. v. Thein , 2008 MT 264, ¶ 80, 345 Mont. 125, 191 P.3d 374, we determined that the fee-shifting provision did allow the recovery of fees for fees. The provision at issue provided that in "disputes arising from performance dictated by this contract" the prevailing party "shall be entitled to recover the costs of such arbitration or litigation, including a reasonable attorney's fee, from the other party." Thein , ¶¶ 74, 80. Unlike the contractual language in Chase , this language did not limit the recovery of fees to actions to enforce the terms of the contract.
¶33 Similar to Chase , the language in the 2006 Agreement limited the recovery of attorney fees to "any action, suit or proceeding to enforce any of the terms, covenants or conditions" of the contract. (Emphasis added). Ferdig Oil did not challenge ROC's entitlement to fees; it challenged only the amount of fees they claimed. Determining the amount of reasonable attorney fees is not an action for enforcement of a term of the contract, but "a dispute over the interpretation of a generic term ... and a factual dispute over the necessity of particular fee claims." Chase , ¶ 32. The District Court erred in awarding ROC's fees generated in determining the amount of attorney fees.
¶34 Ferdig Oil next challenges the District Court's award of costs, because it allowed costs that fall outside of § 25-10-201, MCA. In ***513 determining the proper award of costs allowed under the contract, the District Court focused on the first part of the provision: "In the event any party to this Agreement is compelled to incur any expenses ." (Emphasis added). The District Court determined that this language was broad enough to award all costs, even costs that are not allowable under § 25-10-201, MCA, or decisions from this Court interpreting that provision.
¶35 We have explained that "[o]nly those costs delineated in § 25-10-201, MCA, may be charged to the opposing party unless the item of expense is taken out of § 25-10-201, MCA, by a more specialized statute, by stipulation of the parties or by rule of court." Thayer v. Hicks , 243 Mont. 138, 158, 793 P.2d 784, 796-97 (1990). The District Court incorrectly focused on the broad language in the first part of the provision in determining that the parties had agreed to the recovery of costs outside of the statute. The operative part of the provision allowing for the recovery of court costs in the 2006 Agreement is much narrower: the prevailing party "shall be entitled to recovery of such attorney's fees and all court costs incurred." (Emphasis added). This language does not take the allowable costs out of § 25-10-201, MCA. We remand *127 for the District Court to determine costs allowable under § 25-10-201, MCA, and decisions from this Court interpreting that provision.
¶36 Finally, Ferdig Oil relies on Laudert v. Richland County Sheriff's Department , 2001 MT 287, ¶ 19, 307 Mont. 403, 38 P.3d 790, to argue that fees associated with distinctly different defenses based on different facts should be allocated and apportioned separately. Laudert does not require this. Laudert explained that when a plaintiff in a civil rights case fails to prevail on claims that are unrelated to the claims on which he succeeded, the court must exclude attorney fees related to the unsuccessful claims in the fee calculation. Laudert , ¶ 19. That is not the case here. ROC was successful on all of the claims challenged on appeal. We affirm the District Court's allocation of the fee award.
CONCLUSION
¶37 The District Court's order granting summary judgment is affirmed. We reverse and remand the District Court's award of attorney fees and costs for recalculation to excise the fees incurred to establish the amount of ROC's fee claim and to award only those costs allowed by statute.
We Concur:
MIKE McGRATH, C.J.
INGRID GUSTAFSON, J.
LESLIE HALLIGAN, J.
District Judge Leslie Halligan sitting for Justice Laurie McKinnon