Justice Beth Baker delivered the Opinion of the Court.
*1234 ***139 ¶1 In Abbey/Land LLC v. Interstate Mechanical, Inc. , 2015 MT 77, 378 Mont. 372, 345 P.3d 1032 [hereinafter Abbey/Land I ], we reversed and remanded the District Court's $12 million stipulated judgment against Glacier Construction Partners, LLC ("Glacier") in favor of Abbey/Land LLC ("Abbey/Land"). We remanded with instructions for the District Court to grant James River Insurance Company's ("James River") request to intervene to challenge the reasonableness of the confessed judgment and whether it was the product of collusion.
¶2 After discovery and a hearing on remand, the court determined that the confessed judgment was the product of collusion and was unreasonable. The court reduced the judgment to approximately $2.4 million and ordered Abbey/Land and Glacier to pay James River's attorney fees and costs associated with the proceedings. James River ***140 appeals, and Abbey/Land and Glacier each cross-appeal. We address whether the District Court erred when it:
1. Found the $12 million confessed judgment unreasonable; and
2. Held that the settlement was the product of collusion.
Based on our analysis of these issues, we further address whether the District Court:
3. Fashioned a proper remedy by opting to reduce the settlement amount, rather than dismissing the action; and
4. Properly awarded attorney fees and costs to James River.
¶3 We affirm the District Court's findings that the confessed judgment was unreasonable and the product of collusion. On the basis of those findings, we reverse and remand the District Court's amended judgment with instructions to dismiss Abbey/Land's claim with prejudice. We affirm the District Court's decision to grant attorney fees, although on different grounds. We reverse and remand the attorney fee award for the District Court to reduce the award. Finally, we affirm the District Court's decision to award costs, but reverse and remand for the District Court to recalculate the award to include only costs allowable under § 25-10-201, MCA.
PROCEDURAL AND FACTUAL BACKGROUND
¶4 This case, on appeal to the Court for a second time, is one of several actions in at least two counties and two United States district courts, as well as an arbitration proceeding, arising from the construction of a massive luxury home on Shelter Island, a small island in Flathead Lake, Montana. The instant action was originally filed in September 2009 over construction defects and associated problems.
¶5 Real estate developer Donald G. Abbey formed Abbey/Land in 2000 to purchase Shelter Island and related shoreline properties. Abbey/Land began to build a large residence on Shelter Island in 2001. After problems with the original contractor, Abbey formed Glacier to act as a new general contractor for the project. The construction on Shelter Island was Glacier's only project. Abbey is the sole owner, manager, and member of both Abbey/Land and Glacier.
¶6 On May 1, 2006, Abbey/Land and Glacier entered into a general contract for the construction of the Shelter Island residence. Abbey signed on behalf of both parties. The contract included an arbitration provision, limited the prevailing party's damages to actual damages, and specifically precluded any recovery of consequential damages. Under the contract, Glacier was reimbursed for the cost of all work it performed, including the cost of correcting defective work, but did not earn any profit. The District Court found that Glacier served more as ***141 a construction agent for Abbey/Land than as an independent, at-risk general contractor.
¶7 Glacier subcontracted with Interstate Mechanical, Inc. ("Interstate") for the design and installation of the plumbing and heating-cooling systems for the house. Subsequent change orders increased the value of Interstate's original $1.4 million contract by approximately $1 million. Neither Abbey, Abbey/Land, nor Glacier employed an architect to oversee the changes to the project. Interstate initiated arbitration proceedings in 2009, alleging $806,917.95 in damages arising from Glacier's breach of contract, violations of the Montana Prompt Payment Act, unjust enrichment, constructive fraud, and negligence.
*1235 Glacier counterclaimed against Interstate for $1,608,644.26 in damages due to Interstate's alleged faulty work that Glacier alleged caused damage to the Shelter Island residence and property. Glacier eventually terminated Interstate from the project.
¶8 Abbey/Land and Glacier filed the instant action in Flathead County on September 23, 2009-the day before the scheduled preliminary hearing in the arbitration action. Abbey/Land and Glacier brought claims against Interstate and other subcontractors, seeking compensatory and punitive damages caused by a pipe rupture in October 2008 that flooded the basement with an uncontrolled loss of water. The flooding water over-saturated the septic system drain field, which in turn contaminated the water well with E-coli bacteria. In addition, Abbey/Land claimed Interstate's deficient work caused various other damages, including leaks caused by frozen pipes, heat pumps that did not operate within the permit limits set by the Department of Environmental Quality, and a water treatment system that caused tons of salt and other contaminants to be deposited into the drain field. Abbey/Land and Glacier requested that the arbitration be stayed so they could recover consequential and punitive damages against Interstate in the state court action.
¶9 In response, Interstate sued in the United States District Court for the District of Montana to compel arbitration. The federal court ordered Glacier to arbitrate its dispute with Interstate and stayed the action in state court. On October 11, 2010, after the federal court compelled arbitration, Glacier made the first tender to its comprehensive general liability insurer James River to provide a defense. At that time Glacier was aligned as a plaintiff in this suit. Glacier represented to James River that damages were likely to be in the $1-2 million range. James River denied coverage.
¶10 In January 2011, the arbitrator awarded Glacier $414,021.11 in damages from Interstate. The arbitrator determined that some of ***142 Glacier's claims were not for damages but for betterments, and he refused to make an award for those claims. The arbitrator also found "fault with Glacier in the way this Project was managed and administered," citing Abbey's and Glacier's failure to have "an architect to administer the Project, update schedules, respond to questions regarding ongoing coordination and design issues, and to deal with ongoing changes."
¶11 Immediately after the arbitration award, Abbey took actions to shut down Glacier's operations and transfer all of the company's assets to Abbey/Land and another one of Abbey's companies. Glacier received no compensation for these transfers. Internal e-mails show that the scheduled "shut-down" date for Glacier was February 15, 2011. After Glacier's shutdown and transfer of all assets, Abbey/Land made a written demand against Glacier for the total amount of the arbitration award. Abbey/Land wrote that it had "suffered property damages in a total amount that has yet to be determined and property damages from loss of use will be substantial." It explained that the amount of the arbitration award "is clearly owed to Abbey/Land LLC now, and any payment will be offset against the total amount of property damages ultimately awarded to Abbey/Land LLC from Interstate Mechanical, Inc. and/or Glacier Construction Partners, LLC."
¶12 Shortly after receiving this demand from Abbey/Land, Glacier voluntarily dismissed its claims against all the defendants in this action in April 2011. Abbey/Land's Rule 30(b)(6) designee, William Matteson, testified that also during this time Abbey/Land and Glacier signed an amendment to their general contract. The amendment eliminated the arbitration requirement and removed the prohibition against any award of consequential or punitive damages. The amendment stated that it was "entered into as of June 9, 2009," but counsel who represented Glacier in 2012 appeared not to be aware of the modification, and the amendment did not surface in this litigation until 2013. The District Court found that even if the amendment was executed in April 2011, "[i]t was not in [Glacier's] interest to amend the General Contract to remove significant contractual protections" at that time, because Abbey/Land already had made demands against Glacier.
¶13 Abbey/Land filed its second amended complaint on September 23, 2011, naming Glacier as a defendant. Abbey/Land alleged *1236 that the defendants collectively had been negligent. The second amended complaint contained no specific allegations against Glacier; rather, all of Abbey/Land's claims against Glacier were pass-through claims against the subcontractors. Four days after Abbey/Land filed the second amended complaint, attorney George Best filed a notice of ***143 appearance for Glacier and a motion to admit Jon E. Cushman pro hac vice on behalf of Glacier.
¶14 Glacier renewed its tender for defense to James River on October 5, 2011. James River again denied coverage, citing its prior denial. Other insurers provided Glacier with a defense under reservation of rights and appointed James Cumming to defend Glacier in 2012.[1] While he was defending Glacier, Cumming planned to file a motion to compel arbitration and retained construction expert Mike Herbst. Herbst opined that the drain field was never designed to handle the large waterflow from the residence, such as the twenty-five-gallon-per-minute shower heads, and that Glacier would not be liable for the improperly designed drain field. In a May 2012 e-mail, Cushman instructed Cumming not to disclose Herbst or his opinion to anyone. Shortly after, Cushman insisted the insurance company terminate Cumming. The District Court found that after Cumming's termination, there is no evidence of any effort to mount a defense on behalf of Glacier. Glacier did not issue any discovery to Abbey/Land or depose anyone from Abbey/Land regarding Abbey/Land's damages.
¶15 Cushman filed Glacier's answer on May 7, 2012, admitting nearly all the Complaint's factual allegations and cross-claiming against the other defendants. The only affirmative defense that Glacier raised was that all of Abbey/Land's damages were caused by the conduct of others. It did not raise any affirmative defense about Abbey/Land's comparative negligence, Abbey/Land's duty to mitigate damages, or the enforceability of the arbitration provision. The District Court found that, although Glacier had switched from a plaintiff to a defendant, its legal position had not changed.
¶16 E-mails between Abbey and his various attorneys from 2012 through 2013 reveal extensive attempts to coordinate the litigation strategy between Abbey/Land and Glacier. The e-mails demonstrate that Abbey treated the lawyers for the two companies as one unit. For instance, in April and May 2012, Glacier's attorney Cushman contacted Terry Trieweiler on behalf of Abbey/Land and Abbey to request that Trieweiler appear for Abbey/Land against Glacier. He explained to ***144 Trieweiler that Abbey/Land's prior attorneys had to withdraw after the case was realigned, because they had represented both Abbey/Land and Glacier before the realignment and the realignment created a conflict. He told Trieweiler that "the table is properly set for a healthy recovery" and that the case "has many zeros behind it."
¶17 Trieweiler agreed to represent Abbey/Land on May 21, 2012, and Cushman immediately organized a meeting in Rollins, Montana, for later that month between counsel for Abbey/Land and Glacier, people knowledgeable about the project, and Paul Pederson-Cushman's recommended damages expert for Abbey/Land. Cushman e-mailed the attorneys for Glacier and Abbey/Land before that meeting asking for a joint prosecution agreement to create a blanket attorney-client privilege between Abbey, Abbey/Land, and Glacier. He assured the other attorneys that the common interest criteria for a blanket attorney-client privilege could be met and explained, "When we meet I do not want us to have to act like adversaries. This is not collusion, it is simply recognition that the facts and the law drive this case in one direction: pass through." Abbey/Land and Glacier later relied on this common interest theory to deny discovery requests from one of the defendant subcontractors.
¶18 Most of the participants at the Rollins meeting were Glacier representatives and legal counsel. Pederson did not know on whose behalf he attended; he knew that he was *1237 "there to create a claim for damages." After Pederson sent his preliminary calculations to Trieweiler, Cushman reached out to Pederson directly to opine that Pederson's calculation was missing increased future electrical costs. At Cushman's request, Pederson included an additional $767,000 in increased electrical costs in his damages report for Abbey/Land. Pederson's calculation of Abbey/Land's damages, which-with accumulated interest-approached $17 million by June 2013, is based on assumptions provided primarily by Glacier and its counsel. Pederson divided these damages into four categories: (1) direct cost damages of $1,245,301; (2) future costs to be incurred of $1,186,709; (3) loss of saleable lot of $3,750,000; and (4) loss of use of Shelter Island of $8,430,000.
¶19 Other than the increased future electrical costs, the direct and future cost calculations were primarily the same damages Glacier claimed in arbitration against Interstate. The $3.75 million loss-of-saleable-lot claim arose from the alleged loss of the ability to sell a developable parcel on the island because the drain field would need to be expanded onto the lot. Abbey/Land, however, did not own the alleged affected parcel; at the time, it was held by a separate Abbey ***145 company. The damage figure for the lot was not based on the fair market value of the property, but on a pro rata share of the development costs invested into the Shelter Island complex to that date. There was no evidence in the record of the lot's fair market value or of whether the drain field actually needed to be replaced or expanded onto the lot. Finally, Pederson calculated the loss of use damages based on a hypothetical $281,000-per-month cost to rent a comparable property.
¶20 These calculations from Pederson were the only evidence of damages approaching the $12 million figure that Abbey/Land and Glacier developed prior to the confessed judgment. In fact, on March 22, 2013-about six weeks before Glacier signed the $12 million stipulation-Cushman wrote to Abbey to complain that Trieweiler had not lined up experts to prove the nature and extent of Abbey/Land's damages. Cushman acknowledged that Abbey/Land bore the burden of proof and explained that Abbey/Land "has done absolutely nothing to develop the case in Flathead."
¶21 It was counsel for Glacier who filed Pederson's declaration and damages calculation with the District Court in August 2012. The declaration was signed on letterhead for Glacier's counsel a week before Abbey/Land made a formal demand against Glacier for that amount. In the declaration, Pederson stated that Abbey/Land had retained him. After Abbey/Land made its formal demand on Glacier in August 2012, Cushman made the same demand against the other defendants and their insurers.
¶22 E-mails in August 2012 also show that Cushman directed Trieweiler on the parties' joint trial strategy, telling Trieweiler to amend Abbey/Land's complaint, to bring a motion for summary judgment, and that the companies could seek stipulated judgments in the meantime. In another August e-mail, Cushman wrote to counsel for both companies to discuss "an onslaught of motions being ginned up in the opposing camp" in both the Lake County and Flathead County proceedings[2] , and requesting "a little more coordination amongst us." In September 2012, Cushman again e-mailed attorneys for Abbey/Land and Glacier, notifying them that Abbey wished to minimize his out-of-pocket attorney fees and that work should be performed whenever ***146 possible by attorneys being paid by the insurance companies or working on a contingency fee. He stated that this would require "close coordination" and nominated Trieweiler to "quarterback" the efforts. Abbey replied to the e-mail, asking how much of Cushman's billing was work for Abbey/Land that Trieweiler should be doing and requesting a weekly status call so the attorneys for the two companies could "understand what we are doing as a team." Less than a week after nominating Trieweiler as the "quarterback," Cushman warned that counsel for the insurance companies in the Lake County proceedings planned to challenge any assertion of privilege between *1238 counsel for Glacier and counsel for Abbey/Land. Opposing counsel had expressed offense at Glacier filing the damages report from Abbey/Land's expert in the Flathead litigation. Cushman warned that "we must guard against feeding [the opposing parties'] DGA [Donald G. Abbey] vs. DGA beast."
¶23 On December 14, 2012, Abbey e-mailed attorneys for both companies, notifying them that "By the end of the day, we all have to be on the same game plan, which you will all need to be on board, and everyone knowing that the cash from me has essentially stopped for monthly billing." He told the attorneys to make a "deal amongst yourselves" if they wanted to continue working on a contingency fee basis. Abbey signed such a contingency fee agreement with Cushman on January 15, 2013, that awarded Cushman 16.66 percent of the gross amount of any payment on any judgment or settlement to Glacier, Abbey/Land, or Abbey in the Oregon, Lake County, or Flathead County proceedings. Under this contingency agreement, the larger the award for Abbey/Land against his client, Glacier, the larger Cushman's fee award would be.[3]
¶24 In e-mails on January 14 and 15, 2013, Cushman advocated for Glacier to stipulate to judgment in favor of Abbey/Land. Trieweiler disagreed with this strategy. In fact, when Cushman floated the idea on January 14, 2013, Trieweiler wrote that "you are sure welcome to do that as soon as I'm not the Abbey attorney in Flathead." A few days later, in an e-mail chain discussing whether Trieweiler should answer discovery requests directed to Glacier, Trieweiler wrote to Cushman, "Actually, Jon, we have separate identities except when you decide we don't."
¶25 In early 2013, Trieweiler's strategy focused on negotiating a global settlement with all of the defendants and insurers. Cushman ***147 aggressively opposed this strategy for Abbey/Land. He argued that Abbey/Land should attack defendants and insurers separately to drive up settlement totals and then "go after James River ... for the balance. There is a lot of juice in this apple guys." In March 2013, the strained relationship between Trieweiler and Cushman deteriorated entirely. Trieweiler wrote to Cushman on March 4, expressing his frustration in no uncertain terms about not being able to substantiate the damages calculated by Pederson a year earlier, writing:
You blow hot air all the time about $16 million in damages, and yet, when the other parties ask you to document the damages, you can't do it. You simply refer them to a bunch of boxes stored down in Rollins, where no one seems to have any knowledge about what they include. I know, because we've checked. You don't, because you haven't.
Trieweiler expressed that Abbey/Land had no evidence of damages exceeding $300,000. On March 22, 2013, Trieweiler sent a memo to Abbey outlining the damages he thought could be proven at trial. They included (1) $225,447.96 in past damages; (2) $75,000 in future damages; and (3) $4.2 million in costs associated with replacing the drain field, if it needed to be replaced. Trieweiler explained that two inspectors had visited the drain field and expressed the opinion that it was not permanently damaged or no longer functional. The inspectors agreed that the drain field was inadequate to handle the amount of waste water the house would produce if all showers were used at the same time, but that this was a problem with the original design. Trieweiler suggested that Abbey should settle the case if he was offered $1.5 million or more.
¶26 A week after Trieweiler sent his memo to Abbey, Cushman demanded that Abbey terminate Trieweiler. Cushman wrote, "We can shut him up, and preserve our rights against him for the damage he has done." He explained that Glacier "will immediately, today after Terry is fired, stipulate to judgment in favor of [Abbey/Land]." Cushman reiterated his strategy of negotiating with defendants and their insurers separately to increase the settlement amounts and of pursuing Glacier's own carriers, including James River, last.[4] Abbey fired Trieweiler that same *1239 day with an e-mail written by Cushman. After Trieweiler's firing, Abbey/Land remained without an attorney of record in the Flathead litigation until Best filed his appearance on behalf of Abbey/Land in May 2013. ***148 ¶27 Abbey/Land and Glacier entered into a Settlement Agreement, Assignment of Rights, Mutual Release, and Covenant Not to Execute ("Settlement Agreement") on May 2, 2013. Abbey wrote to Cushman shortly before the Settlement Agreement was signed to ask whether he should appoint Robert Jenkins, in-house counsel at one of his companies, as an officer of Glacier and have him sign the Settlement Agreement for Glacier "just for appearance sake." Robert Jenkins ultimately signed the Settlement Agreement on behalf of Abbey/Land, listing his title as "VP." Abbey signed on behalf of Glacier. Under the Settlement Agreement, Glacier would stipulate to judgment in favor of Abbey/Land for $12 million, with a twelve-percent-per-annum interest rate from the date of judgment, and assign any claims it may have against any insurer. In exchange, Abbey/Land would agree not to execute against Glacier, but would seek to enforce the judgment against other defendants and insurance companies, including Glacier's insurer James River. The Settlement Agreement required that it be submitted to the court "for a determination it was entered in good faith, at arm's length considering the risk." Abbey also signed a conflict of interest waiver on behalf of himself, Abbey/Land, and Glacier, allowing for the same counsel to represent both companies going forward and "assum[ing] the risk of an adverse result at the reasonableness hearing." Glacier signed the Confession of Judgment and Judgment on May 6, 2013, and filed it with the court. Best and Cushman filed notices with the District Court that they now represented both Abbey/Land and Glacier.
¶28 Following the confession of judgment, Abbey/Land and Glacier entered into a series of settlements with the other defendants and dismissed them from the suit, leaving only Glacier as a defendant in the case. The District Court found that companies owned and controlled by Abbey, including Abbey/Land and Glacier, have received a combined total of approximately $2.5 million through these settlement agreements, including a $500,000 settlement with Interstate. The settlement with Interstate resolved all claims held by Abbey, or any company owned by Abbey, and covered the arbitration award, as well as settlement and dismissal of the Oregon, Flathead County, and Lake County matters.
¶29 James River filed a motion to intervene in the case in August 2013. The District Court did not rule on this motion. On Abbey/Land's motion, the District Court entered judgment against Glacier in the amount of the stipulated settlement on March 17, 2014, without a hearing. James River appealed, arguing it should have been allowed to intervene to challenge the reasonableness of the confession of judgment ***149 and whether it was the product of collusion.
¶30 On March 10, 2015, this Court issued Abbey/Land I , reversing entry of the $12 million judgment against Glacier in favor of Abbey/Land and holding that the District Court should have allowed James River to intervene to challenge the reasonableness of the confessed judgment and whether it was the product of collusion. Abbey/Land I , ¶ 17. Upon remand, James River filed a counterclaim and cross-claim in intervention. James River sought a declaration that the confession of judgment was unreasonable and collusive and that James River be absolved from any responsibility under the judgment or the insurance policy it issued. James River requested dismissal of the case in its entirety with prejudice, as well as attorney fees and costs as allowed under § 27-8-313, MCA.
¶31 Abbey/Land attempted to avoid a reasonableness hearing on remand. It filed notice that it was withdrawing its motion to enter judgment on the settlement agreement and intended to go to trial. It then filed a stipulation to arbitrate, arguing that Glacier and Abbey/Land's contract required them to arbitrate their disputes. James River opposed this motion. The District Court ultimately denied Abbey/Land's efforts, ruling that the court "cannot sanction transferring this matter to arbitration under the guise of the illusion of an adversary proceeding" and that Abbey/Land could not unilaterally withdraw from the settlement agreement.[5]
*1240 ¶32 The District Court provided the parties with the parameters for its reasonableness and collusion analysis and allowed for limited discovery on those issues. It held a hearing on July 17, 2017, and issued its findings of fact, conclusions of law, and order the following day. The court found that the confession of judgment was unreasonable and the product of collusion. But it declined to dismiss the case as "too dramatic a remedy." Instead, the court adjusted the settlement downward to what it determined was a reasonable amount: $2,432,010, plus 6.75 percent interest from the date of judgment. The court awarded attorney fees and costs to James River under its "inherent powers" as a consequence for Abbey/Land and Glacier's collusive conduct. The court determined the amount of the attorney fees and costs award in a separate order after a hearing on the matter, and entered judgment for James River in the amount of $925,619.87 for fees and costs, for which Abbey/Land and Glacier are jointly and severally liable.
***150 STANDARDS OF REVIEW
¶33 We review findings of fact for clear error. Roland v. Davis , 2013 MT 148, ¶ 21, 370 Mont. 327, 302 P.3d 91. Clear error exists if substantial credible evidence fails to support the findings of fact, if the district court misapprehended the effect of the evidence, or if we have a definite and firm conviction that the district court made a mistake. Roland , ¶ 21. We review the district court's conclusions of law for correctness. Roland , ¶ 21. We discuss other standards of review as related to the issues below.
DISCUSSION
¶34 When an insurer wrongfully refuses to defend its insured, "the insured is justified in taking steps to limit his or her personal liability," including entering into a stipulated judgment with a covenant not to execute and an assignment of rights. State Farm Mut. Auto. Ins. Co. v. Freyer , 2013 MT 301, ¶ 34, 372 Mont. 191, 312 P.3d 403 (quoting Old Republic Ins. Co. v. Ross , 180 P.3d 427, 433 (Colo. 2008) ). The insurer becomes liable to the insured for the resulting defense costs, judgments, or settlements. See J & C Moodie Props., LLC v. Deck , 2016 MT 301, ¶ 21, 385 Mont. 382, 384 P.3d 466 ; Abbey/Land I , ¶ 12 ; Freyer , ¶¶ 35-36. A stipulated judgment is presumptively enforceable as the measure of damages. See J & C Moodie Props., LLC , ¶ 21 ; Abbey/Land I , ¶ 12 ; Freyer , ¶¶ 35-36. "[W]e have recognized[, however,] the opportunity for mischief in settlement negotiations where the insurer has declined involvement-which may be checked by judicial review of whether the settlement amount stipulated to is reasonable." Tidyman's Mgmt. Servs. Inc. v. Davis , 2014 MT 205, ¶ 40, 376 Mont. 80, 330 P.3d 1139 [hereinafter Tidyman's I ]. Thus, the insurer will be bound by its insured's settlement and any resulting judgment so long as the settlement is reasonable and not the product of collusion. See Abbey/Land I , ¶¶ 12-17 ; Tidyman's I , ¶ 40. "The court cannot ... surrender its duty to see that the judgment to be entered is a just one nor is the court to act as a mere puppet in the matter." 46 Am. Jur. 2d Judgments § 183 (2018).
¶35 The insurer bears the initial burden in challenging the stipulated settlement. Tidyman's I , ¶ 41. The insurer "must set forth specific facts" demonstrating that the settlement amount is unreasonable or the product of collusion and must request a reasonableness hearing. Tidyman's I , ¶ 41. We determined in Abbey/Land I that James River was entitled to intervene and request a reasonableness hearing. Abbey/Land I , ¶ 17. This appeal arises from that reasonableness hearing. We review and address the District ***151 Court's reasonableness and collusion determinations in turn.
Reasonableness
¶36 On remand, the District Court allowed for limited discovery on the issue of reasonableness and collusion. It also laid out the legal framework that it intended to utilize in determining the reasonableness of the stipulated judgment. The District Court considered the merits of the pleaded claims and defenses to them, the parties' resources to litigate, the amount of potential recovery had the case gone to trial, the costs of continued litigation, the comparative negligence of and recovery from other defendants, the amount of insurance coverage, Glacier's financial condition and risk of personal exposure, and the *1241 risks to Abbey/Land in moving forward to collect on the confessed judgment.
¶37 We review de novo "a district court's decision about which legal standard to apply in assessing the reasonableness of a stipulated judgment." See Tidyman's Mgmt. Servs. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh , 2016 MT 201, ¶ 8, 384 Mont. 335, 378 P.3d 1182 [hereinafter Tidyman's II ]. We review its findings of fact for clear error. See Roland , ¶ 21.
¶38 In Tidyman's II , we explained that district courts must consider "what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim. This involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." Tidyman's II , ¶ 15 (quoting Miller v. Shugart , 316 N.W.2d 729, 735 (Minn. 1982) ). In addition, "a district court should objectively consider both the merits of the underlying case and the value to a prudent uninsured defendant of confessing judgment in exchange for a covenant not to execute." Tidyman's II , ¶ 15. The District Court's framework for analysis was appropriate in light of our holdings in Tidyman's I and II and Abbey/Land I and the circumstances of this case.
¶39 In its factual findings, the District Court determined that the damages likely would have been substantially less than $12 million had the matter been taken to trial with Glacier actually mounting a defense. The court considered the depositions of record and the exhibits therefrom, additional testimony the parties presented at the reasonableness hearing, and seventy-six exhibits admitted during the hearing. The court found that the original arbitration provision in the general contract likely would have excluded recovery for the bulk of Abbey/Land's claimed damages-damages for loss of use and loss of saleable lot. The court found further that, even if Abbey/Land and Glacier effectively amended the general contract to remove the ***152 arbitration provision and damages limitation, serious questions about the calculations for the loss of use and loss of saleable lot remained. The District Court found that Pederson likely would not have been able to testify to these damages for a lack of foundation and necessary expertise. The court also opined that, based on the record, a jury could have found that Abbey/Land failed to mitigate its loss of use damages by not simply fixing the property. The court also considered Glacier's relative negligence compared to other settling defendants and found that Glacier admitted no independent negligence separate from its responsibility for its subcontractors. Both Abbey/Land and Glacier maintained that Interstate was the primary liability defendant, but they settled all claims with Interstate for $500,000, including the arbitration award. More, the court determined that Glacier had no risk of personal exposure because, at the time of the settlement, Glacier no longer was a going concern and all of its assets already had been distributed to other Abbey entities, including Abbey/Land.
¶40 The court had before it testimony from expert and fact witnesses, a history of the parties' dealings through e-mails and correspondence entered into evidence, and considerable evidence about the underlying problems encountered in the Shelter Island project. When the trial court is the factfinder, "[i]t is the province of the trial court to weigh the evidence and resolve any conflicts between the parties' positions, and this Court will not second-guess the trial court's determinations as to the strength and weight of conflicting testimony." Meine v. Hren Ranches, Inc. , 2015 MT 21, ¶ 20, 378 Mont. 100, 342 P.3d 22. "The question is not whether there is evidence to support different findings, but whether substantial evidence supports the findings made." Meine , ¶ 20. The District Court's findings are supported by substantial evidence in the record and are not clearly erroneous. Based on this record, we affirm the court's determination that the $12 million consent judgment was not reasonable considering "both the merits of the underlying case and the value to a prudent uninsured defendant of confessing judgment in exchange for a covenant not to execute." Tidyman's II , ¶ 15.
Collusion
¶41 When an insurer fails to provide a defense, it is not per se fraudulent or *1242 collusive for its insured to sign a consent judgment and assign its rights against the insurer to a third-party claimant and to receive a covenant not to execute in return. Tidyman's I , ¶¶ 46-50. By executing such an agreement, the insured attempts to protect itself from the exposure to personal liability to which the insurer exposed it. In Tidyman's I , we explained that we could "envision a case where a ***153 collusion inquiry might be relevant." Tidyman's I , ¶ 50. In Abbey/Land I , we sent this case back to the District Court to allow James River to seek that inquiry. Abbey/Land I , ¶ 17. Similar to our review of a district court's determination of reasonableness, we review de novo the district court's decision about which legal standard to apply in assessing whether the stipulated judgment was the product of collusion. See Tidyman's II , ¶ 8. The District Court's factual findings that a settlement agreement was collusive are reviewed for clear error. See Roland , ¶ 21. The insurer that breached its duty to defend bears the burden of showing that the agreement was fraudulent or collusive. See Tidyman's I , ¶ 41 ; Tidyman's II , ¶ 37; see also Andrew v. Century Sur. Co. , 134 F.Supp.3d 1249, 1268 (D. Nev. 2015).
¶42 In Tidyman's I , we explained that "[t]he term 'collusion' implies the existence of some sort of agreement aimed at defrauding another or otherwise breaking the law." Tidyman's I , ¶ 48 ; see also 37 Am. Jur. 2d Fraud and Deceit § 5 ("Collusion is an agreement between two or more persons to defraud another of his or her rights by the forms of law or to secure an object forbidden by law. Collusion, as far as the law is concerned, has been deemed to be a species of fraud."). We required the insurer to point to evidence of an effort towards wrongdoing between its insured and the third-party claimant. Tidyman's I , ¶ 48. We held that the lack of incentive to minimize the settlement amount, without more, was not sufficient to demonstrate collusion. Tidyman's I , ¶ 48. Similarly, we hold that, without more, the shared ownership of parties entering into a stipulated settlement agreement is not per se collusive. There is nothing inherently collusive in a real estate developer holding interests both in a company owning a real estate development project and in a construction business, or for those two entities to contract with one another. The mere fact of shared ownership is not an adequate basis for a finding of fraud or collusion. See Lexington Ins. Co. v. Scott Homes Multifamily, Inc. , No. CV-12-02119-PHX-JAT, 2015 WL 751204, at *26, 2015 U.S. Dist. LEXIS 21205 at *69-71 (D. Ariz. Feb. 23, 2015) (holding that "there is nothing inherently fraudulent in a real estate developer having an equity stake in both a real estate project and a construction business, and for those two entities to contract with each other" and requiring additional evidence to prove collusion). Witnesses from both sides testified that such arrangements are common in the industry to protect assets and to obtain additional layers of insurance coverage. But our review does not end there. Abbey/Land's and Glacier's conduct did not involve just shared ownership and favorable corporate structuring. We examine the additional evidence to determine whether it supports the District ***154 Court's finding of impermissible collusion.
¶43 The particular circumstances and facts of each case direct what factors the court should consider in its analysis. Rejecting the insurer's claims of collusion in Tidyman's I , for example, we considered a number of facts raised by the insurer and determined that none of those facts rose to the level of collusion. Specifically, we rejected the insurer's contentions that the relatively quick timing and negotiation of the settlement agreement after the insurer denied coverage established wrongdoing, agreeing with the district court that this argument was speculative. We further explained that any concerns with the settlement amount could be addressed through the reasonableness inquiry and noted the absence of evidence that the insureds participated in determining the amount of damages claimed where the settlement amount was supported by a valuation that was executed before the proceedings began. Finally, we rejected contentions that the plaintiff's choice not to include a certain party as a defendant was an improper manipulation of the pleadings to manufacture coverage. We held that the facts raised by the insurer in Tidyman's I did not demonstrate collusion. Because the insurer failed to provide evidence to overcome the presumption *1243 that the settlement agreement was enforceable as the measure of damages, no further inquiry into collusion was required. Tidyman's I , ¶¶ 47-49.
¶44 Case law from other jurisdictions supports this case-specific approach. See, e.g. , Fireman's Fund Ins. Co. v. Imbesi , 361 N.J.Super. 539, 826 A.2d 735, 752-58 (App. Div. 2003) (directing collusion inquiry toward the parties' failure to substantiate claims, failure to rebut claims, suspicious terms of the agreement, and concealment); Andrew , 134 F.Supp.3d at 1268 (applying Nevada law and explaining that "[s]ome examples of fraud or collusion are self-evident, such as where the insured agrees to testify falsely to create coverage or the parties collusively agree to an unsupportable amount of damages. But generally what may constitute fraud or collusion is a fact-intensive inquiry determined on a case-by-case basis." (internal citations omitted) ); Sidman v. Travelers Cas. & Sur. , 841 F.3d 1197, 1203 (11th Cir. 2016) (applying Florida law and explaining that "courts [should] look to evidence of an unreasonable settlement amount and of bad faith on the part of the negotiating parties as proxies for collusion or fraud"); Safeco Ins. Co. of America v. Parks , 170 Cal.App.4th 992, 88 Cal.Rptr.3d 730, 748 (2009) ("In this context, collusion occurs when the insured and the third party claimant work together to manufacture a cause of action for bad faith against the insurer or to inflate the third party's recovery to artificially increase damages flowing from the insurer's breach.");
***155 Cent. Mut. Ins. Co. v. Tracy'sTreasures, Inc. , 385 Ill.Dec. 904, 19 N.E.3d 1100, 1120 (2014) ("[A] settlement becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant." (internal quotations omitted) ). As one California court of appeals put it, "[t]he facts and circumstances which will lead a court to conclude that either [fraud or collusion] are present are limited only by the imagination of those who would cheat and deceive." Pruyn v. Agric. Ins. Co. , 36 Cal.App.4th 500, 42 Cal.Rptr.2d 295, 314 (1995).
¶45 Neither Abbey/Land nor Glacier challenges the District Court's findings of fact as clearly erroneous. All parties deposed, submitted reports from, and called competent experts, including competing legal experts with significant experience and impeccable credentials. Upon careful review of the whole record, we conclude that the District Court's factual findings have ample support in the record and are not clearly erroneous. The District Court's unchallenged findings highlight multiple instances of impermissible collusive conduct.
¶46 Among the noteworthy examples, the parties amended their contract to expose Glacier to consequential damages after the arbitrator made findings suggesting Glacier's responsibility for some of Abbey/Land's damages by failing to hire an architect. Abbey/Land and Glacier fully acknowledge that the parties were realigned because of these arbitration findings, but do not explain why-absent collusion-a party in Glacier's position also would agree to amend the contract to expose itself to greater liability after its potential malfeasance had been found in a binding proceeding.
¶47 E-mails show that Abbey directed his attorneys for the two companies to operate as a team on a unified strategy and actively removed attorneys who attempted to defend against or did not support, full-throatedly, an overly inflated award. And Pederson, ostensibly hired as a damages expert for Abbey/Land, calculated his damages based on assumptions provided primarily by Glacier and its counsel, who requested specific additions to the calculations to increase the damages alleged against Glacier. As noted by James River's Rule 30(b)(6) designee, Abbey's various corporate structures, designed to create multiple layers of insurance and pass through liability to subcontractors, are not uncommon in the industry. Realigning the parties to access additional insurance coverage, is not-all things being even-impermissible collusion. But when parties choose to organize themselves in a corporate structure to maximize protection of assets and insurance coverage, they also must accept the limitations of that structure. To receive the benefits of being separate entities, they must ***156 act as separate entities. They may not disregard the corporate structure of both entities and work collusively for the sole benefit of Donald Abbey. *1244 ¶48 Nor can Glacier dismiss Cushman's conduct as the actions of a rogue attorney. The voluminous e-mails in this case show that Abbey was an active participant in this litigation and was well aware of and supported the strategy Cushman pursued. Abbey is a sophisticated businessman and an experienced litigant. In a chain of e-mails in December 2011, Abbey discussed ongoing negotiations to settle with a separate insurance company involved in the Shelter Island project and threatened to unleash Cushman against that insurer, stating, "I am about 15 for 15 in collecting money and court victories in Montana."
¶49 Abbey/Land and Glacier both challenge the District Court's legal conclusions regarding collusion. Abbey/Land maintains that, before our decisions in Tidyman's I and II and Abbey/Land I , insurance companies could not challenge stipulated judgments on grounds that they were the product of collusion. In other words, Abbey/Land argues, before those decisions issued, collusion was permissible and was "nothing other than the usual custom and practice in which parties engage in Montana as a consequence of an insurer's failure to defend." Tidyman's I , ¶ 48 (quoting Nielsen v. TIG Ins. Co. , No. CV 05-47-M-DWM, 2006 WL 8435912, at *12, 2006 U.S. Dist. LEXIS 49002 at *38 (D. Mont. May 4, 2006) ). It argues that at the time of its actions, it did nothing impermissible. In contrast, Glacier maintains that it did not engage in collusion because collusion requires a secret understanding or a secret arrangement, and its conduct was open and on the record.
¶50 We reject both arguments. First, we reject Abbey/Land's contentions that before our decisions in the Tidyman's cases and Abbey/Land I collusion was acceptable. These decisions did not suddenly make collusion unlawful when it had been lawful before. The law governing settlements involving consent judgments with covenants not to execute always has required that the parties proceed with good faith. As we recognized in Tidyman's I , this Court upheld the settlement at issue in Independent Milk & Cream Company v. Aetna Life Insurance Company , 68 Mont. 152, 157, 216 P. 1109, 1110 (1923), after determining that it was "fair and reasonable." Tidyman's I , ¶ 40. In Independent Milk & Cream Company , we quoted § 8169, RCM (1921)-now codified at § 28-11-316, MCA -to explain that when an insurer wrongfully fails to defend its insured, "a recovery against the [insured], suffered by [the insured] in good faith " is allowed against the insurer. Indep. Milk & Cream Co. , 68 Mont. at 158, 216 P. at 1111 (emphasis added). We explained that "the burden is upon the insurer ***157 to rebut the foregoing presumption." Indep. Milk & Cream Co. , 68 Mont. at 158, 216 P. at 1111. Thus, the law always has required the parties to proceed in good faith and has placed the burden on the insurer to rebut the presumption that the parties acted in good faith-as James River did here. As we recognized in Tidyman's I , there is a difference between an insured and an injured party-whose interests may not be completely adverse-negotiating and entering into an arms-length settlement in good faith and such parties engaging in collusive conduct designed to expose the insured to new liability, devise a confessed judgment to maximize a damages calculation, and terminate and "shut up" anyone involved in the case who expressed contrary views. See Tidyman's I , ¶ 40. Abbey/Land cites no authority countenancing such practices.
¶51 Glacier's argument that there was no collusion because the parties' conduct was in the open is equally unpersuasive. Admittedly, any negotiated settlement involves cooperation to a degree. But a settlement "becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant." Cont'l Cas. Co. v. Westerfield , 961 F.Supp. 1502, 1505 (D.N.M. 1997) (internal quotation omitted). As the Westerfield court explained, "although concealment might qualify as further evidence of collusion, it is not a necessary element of a collusive agreement." Westerfield , 961 F.Supp. at 1506. And the facts found by the District Court make clear that not all of Abbey/Land's and Glacier's dealings were transparent, to say the least.
¶52 The District Court considered a number of factors in reaching its determination that the settlement was the product of collusion. The court first considered the *1245 settlement amount, which it had found to be unreasonable. It also determined that the parties' use of the common interest doctrine to shield communications between them demonstrated an intent to conceal that the settlement was not reached at arms' length. Further, the court determined that Glacier worked behind the scenes to suppress any evidence that the damages were less than Pederson had opined. The court also determined that there was no negotiation on damages; rather, Glacier worked closely with Pederson to develop and increase Abbey/Land's damages and actively assisted in the maintenance of Abbey/Land's claims against it. In this regard, the court specifically discussed that Glacier admitted all allegations of liability and damages in Abbey/Land's complaint and failed to raise meaningful affirmative defenses; Glacier agreed to amend the terms of the contract to allow consequential damages after the litigation had commenced; Glacier silenced any party that ***158 attempted actually to defend it; Glacier's attorney Cushman was working under a contingency fee agreement based on any recovery for Abbey/Land, Glacier, or other Abbey entity; and Glacier's designated Rule 30(b)(6) corporate representative could not identify one thing Glacier did to refute or minimize the amount of damages Abbey/Land asserted against it.
¶53 Considering these findings-all of which have substantial grounding in the record-we affirm the District Court's conclusion that the stipulated judgment between Abbey/Land and Glacier was the product of collusion. The $12 million settlement was contrived to inflate Abbey's recovery to the detriment of James River beyond what should have been a reasonable liability exposure for its insured, and the District Court did not err in concluding that it was not the product of a good-faith, arms-length transaction.
Remedy
¶54 The District Court determined that outright dismissal of the action was not appropriate, concluding that it would be equitable to reduce the confessed judgment to a reasonable amount and to grant James River the attorney fees and costs it expended challenging the confessed judgment. Its resulting amended judgment in the amount of $2,432,010 against Glacier in favor of Abbey/Land accounted for the direct cost and future cost damages that Abbey/Land claimed.
¶55 James River maintains that upon a finding of collusion, the District Court should have dismissed the action in its entirety. Glacier responds, somewhat ironically, that the record supports a finding that the $2.4 million judgment was reasonable and that because equity abhors a forfeiture, dismissal of the case would not be proper. Abbey/Land relies on case law from Washington State to argue that if a stipulated judgment is unreasonable or the product of collusion, the district court has the authority to determine a reasonable settlement amount. Abbey/Land also maintains that James River is not entitled to the equitable relief of dismissal, because it failed to defend Glacier and therefore has unclean hands. Abbey/Land finally argues that this Court must review the stipulated judgment with reference to the law at the time of its making and that at the time of the stipulation, such agreements could not be challenged as collusive, making dismissal improper.
¶56 Dismissal of a collusive case is within a district court's inherent powers. See, e.g. , Carlson v. City of Helena , 38 Mont. 581, 584, 101 P. 163, 164 (1909) ; Damron v. Sledge , 105 Ariz. 151, 460 P.2d 997, 1001 (1969). In Carlson , we held that if the controversy between the parties is entirely contrived the court "should feel constrained ... to dismiss the ***159 [case]." Carlson , 38 Mont. at 584, 101 P. at 164. In the present case, the suit between the parties was not contrived entirely; no party suggests that Abbey/Land sustained no damages. But, as amply recounted in this Opinion, the parties did collude to artificially increase damages for an inflated judgment to enforce against the insurers. In such a case, when the circumstances call for it, the court has the authority and responsibility to dismiss. Because dismissal in such cases is an equitable remedy, we will review a trial court's decision not to dismiss a case for an abuse of discretion. See Ruegsegger v. Welborn , 237 Mont. 317, 321, 773 P.2d 305, 308 (1989) ("We have held that *1246 equitable issues are a matter of discretion resting with the District Court and will be sustained unless an abuse of discretion is shown.").
¶57 Despite its finding of collusion, the District Court decided dismissal was too harsh a remedy due to the policy of protecting insureds when an insurer refuses to defend. Breach of James River's duty to defend, however, was not an issue in this case. And we have recognized that "it should not be the court's objective to further punish the insurer for its failure to defend its insured. The insurer has already suffered the consequence of its failure to defend by having lost the right to invoke insurance contract defenses as well as the right to assert its policy limits." Tidyman's II , ¶ 14. Whether to dismiss after finding that a confessed judgment is the product of collusion instead should focus on the collusive actions themselves. Dismissal should occur not for the benefit of the insurer, but to protect the interests of justice and the integrity of the courts. District courts should consider whether allowing colluding parties to recover under the circumstances would contravene public policy or whether withholding relief would offend our system of justice to a greater extent than would allowing relief. Cf. 37 Am. Jur. 2d Fraud and Deceit § 289 (2018) ; Waller v. Engelke , 227 Mont. 470, 477-78, 741 P.2d 385, 389-90 (1987) (explaining that under the in pari delicto doctrine, "where offenses have involved criminal conduct or delinquency of which the law strongly disapproves as a matter of public policy, the parties are to be deemed equally guilty and courts will not inquire further into their relative guilt. ... [T]he fundamental concern should be whether the public good will be enhanced"). A court must consider whether granting any relief under the inflated confessed judgment would impair the public's trust in the judicial system or offend public policy.
¶58 The extraordinary record in this case shows that Abbey/Land and Glacier did not engage in "the usual custom and practice in which parties engage in Montana as a consequence of an insurer's failure to defend." Tidyman's I , ¶ 48 (quoting ***160 Nielsen , 2006 WL 8435912, at *12, 2006 U.S. Dist. LEXIS at *38 ). Rather, they impermissibly colluded to expose Glacier to new liability by amending the parties' contract to expand the recoverable damages, stipulated to a confessed judgment for damages that attorneys for both parties had at different times criticized as lacking evidentiary basis, and terminated and "shut up" anyone involved in the case who expressed contrary views. The District Court in this case faced evidence of collusion so egregious that dismissal of Abbey/Land's claims against Glacier was the only appropriate remedy.
¶59 Abbey/Land relies primarily on the Washington Court of Appeals' decision in Water's Edge Homeowners Association v. Water's Edge Associates , 152 Wash.App. 572, 216 P.3d 1110 (2009), to support its argument that entering a revised judgment was proper as a matter of law. This case is not persuasive, however, because (1) Washington has a specific statutory process and remedy that Montana does not have, see Wash. Rev. Code § 4.22.060 (2018)[6] , and (2) even the court in Water's Edge said the trial court could not sua sponte enter judgment in a certain amount, Water's Edge , 216 P.3d at 1126.[7]
¶60 Under the particular facts of this case and especially under the detailed factual findings of the trial court, the District Court abused its discretion when it refused to dismiss the action. Abbey/Land's and Glacier's actions are offensive to our sense of justice, and to allow recovery under these circumstances would impair the public's trust in the judicial system. We reverse the court's entry of judgment and remand with instructions to dismiss with prejudice.
*1247 Attorney Fee Award
¶61 The District Court awarded James River its attorney fees and costs based on the court's "inherent powers." Abbey/Land and Glacier both appeal the court's award of attorney fees, maintaining that this case does not fall under the limited exception to the American Rule articulated by this court in Foy v. Anderson , 176 Mont. 507, 580 P.2d 114 (1978). Abbey/Land and Glacier further maintain that James River cannot collect attorney fees under the insurance exception ***161 to the American Rule. They argue that the insurance exception allows a first-party insured to recover attorney fees from the insurer only when the insured is compelled to commence legal action to obtain bargained-for benefits under an insurance contract and that there is no reciprocal right for an insurer to obtain attorney fees against an insured. Glacier also argues that fees cannot be awarded under § 27-8-313, MCA, under the Uniform Declaratory Judgment Act ("UDJA"), because the Flathead case is not a declaratory judgment action; rather, it posits, all declaratory judgment issues are "irrevocably ensconced in the Lake County matter." Finally, Abbey/Land and Glacier challenge the reasonableness of the fee award amount. Abbey/Land argues that the District Court erred because it should have calculated the award using the lodestar method. Glacier argues that the District Court erroneously included $16,677.51 in fees that James River specifically had withdrawn and allowed recovery of fees for work that should have been done in the Lake County case.
¶62 We review a district court's conclusion regarding the existence of legal authority to award attorney fees for correctness. City of Helena v. Svee , 2014 MT 311, ¶ 7, 377 Mont. 158, 339 P.3d 32. If legal authority exists, we review a district court's order granting or denying attorney fees for an abuse of discretion. Svee , ¶ 7. An abuse of discretion occurs when the district court acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice. Renville v. Farmers Ins. Exch. , 2004 MT 366, ¶ 24, 324 Mont. 509, 105 P.3d 280.
¶63 Montana follows the American Rule for attorney fees, which prohibits fee-shifting in most cases, absent statutory or contractual authority to the contrary. Goodover v. Lindey's , 255 Mont. 430, 445, 843 P.2d 765, 774 (1992). "In isolated instances, a district court may award attorney[ ] fees to make an injured party whole under its equity powers." Goodover , 255 Mont. at 446, 843 P.2d at 774-75 (citing Foy , 176 Mont. at 511-12, 580 P.2d at 116-17 ). Courts in Montana may invoke this "equitable" exception to the American Rule infrequently and "only in cases with particularly limited facts." Goodover , 255 Mont. at 446, 843 P.2d at 775. We explained in Goodover that "[t]his equitable exception to the general rule is available in those unique factual situations in which a party is forced into a frivolous lawsuit and must incur attorney[ ] fees to dismiss the claim." Goodover , 255 Mont. at 447, 843 P.2d at 775.
¶64 We also have recognized an insurance exception to the American Rule. That exception entitles a first-party insured to recover attorney fees "whenever an insurer forces its insured to assume the burden of ***162 litigation to obtain what the insured is entitled to under an insurance contract." See Mlekush v. Farmers Ins. Exchange , 2017 MT 256, ¶ 18, 389 Mont. 99, 404 P.3d 704 (quoting Riordan v. State Farm Mut. Auto. Ins. Co. , No. CV 07-38-M-DWM-JCL, 2008 WL 2512023, at *4, 2008 U.S. Dist. LEXIS 47734 at *11 (D. Mont. June 20, 2008) ). We have carefully limited the application of this exception to prevent the exception from swallowing the rule. See, e.g. , Jacobsen v. Allstate Ins. Co. , 2009 MT 248, ¶ 22, 351 Mont. 464, 215 P.3d 649 ; Mountain W. Farm Bureau Mut. Ins. Co. v. Brewer , 2003 MT 98, ¶ 40, 315 Mont. 231, 69 P.3d 652. And we have never applied it to allow an insurer to recover fees from an insured.
¶65 We agree with Glacier and Abbey/Land that this case does not fall under the narrow equitable exception outlined in Foy or under the insurance exception as discussed in Brewer . Under the circumstances, we decline the invitation to expand these limited equitable exceptions to the American Rule. In this case, however, there is a statutory basis for the award of attorney fees that James River expressly pleaded.
*1248 James River filed its counterclaims and cross-claims under the UDJA, seeking a declaration that the stipulated judgment was unreasonable and collusive. It specifically sought fees under § 27-8-313, MCA, which allows the court to award "[f]urther relief ... whenever necessary or proper." That relief may include attorney fees. Trs. of Ind. Univ. v. Buxbaum , 2003 MT 97, ¶ 42, 315 Mont. 210, 69 P.3d 663. The further relief provided under § 27-8-313, MCA, is separate from either the equitable exception of Foy or the insurance exception to the American Rule. And despite Glacier's protestations to the contrary, James River pleaded a declaratory judgment action in intervention. The declaratory judgment that James River sought-that the stipulated judgment was unreasonable and collusive-properly was raised in these proceedings, rather than in the separate coverage case ongoing in Lake County. See Abbey/Land I, ¶ 15. Section 27-8-313, MCA, authorized the court to award attorney fees, if "necessary and proper."
¶66 The availability of attorney fees is not automatically presumed, nor are fees warranted in garden-variety declaratory judgment actions. See Citizens for a Better Flathead v. Bd. of Cty. Comm'rs of Flathead Cty. , 2016 MT 325, ¶ 61, 385 Mont. 505, 386 P.3d 567. As a threshold question, the equities must support a grant of attorney fees. United Nat'l Ins. Co. v. St. Paul Fire & Marine Inc. , 2009 MT 269, ¶ 38, 352 Mont. 105, 214 P.3d 1260 ; see also Svee , ¶ 20 (discussing case law regarding whether equities support a grant of attorney fees under § 27-8-313, MCA ).
¶67 If the equities support a grant of attorney fees under § 27-8-313, MCA, we consider three "tangible parameters" as articulated in ***163 Renville , ¶ 27. Under these parameters, fees are "necessary and proper" when (1) the other party "possesses" what the party filing the declaratory judgment sought in the litigation; (2) the party filing the declaratory judgment action needed to seek a declaration showing that it is entitled to the relief sought; and (3) the declaratory relief sought was necessary in order to change the status quo. Buxbaum , ¶ 45 ; Renville , ¶ 27.
¶68 The equitable considerations in this case support an award of attorney fees under § 27-8-313, MCA. This was no garden-variety declaratory judgment action. Rather, after remand from this Court for the express purpose of allowing James River to bring its challenge, the District Court found evidence of egregious collusion and disrespect for the judicial process by and between Glacier and Abbey/Land. After the parties abused the judicial process for their own benefit by colluding to inflate a stipulated judgment, James River was not on equal footing with the colluding parties. Given James River's high burden to upset the presumption of reasonableness and the evidence it painstakingly discovered and successfully revealed in order to meet that burden, the equities support an award of attorney fees under § 27-8-313, MCA.
¶69 Having determined that the equities support an award of attorney fees, we turn to the three prongs of the tangible parameters test. In this action, James River sought a declaration that Glacier and Abbey/Land had engaged in impermissible collusion to create an inflated damages award and then stipulated to an unreasonable confessed judgment that they intended to impose on James River. Glacier and Abbey/Land possessed the evidence of their impermissible collusion to create an inflated award. Without a declaration that the confessed judgment was unreasonable and the product of collusion, James River potentially would have been liable to Abbey/Land for the inflated judgment, depending on the outcome of the Lake County coverage case. The declaratory judgment was necessary to change the status quo and to protect James River from this inflated liability. An award of attorney fees was proper under § 27-8-313, MCA.
¶70 Because we conclude that legal authority exists to support the District Court's award of attorney fees, we address Glacier and Abbey/Land's contentions that the fee award was unreasonable and an abuse of the court's discretion. Abbey/Land maintains that the District Court abused its discretion because it did not use the lodestar method, which consists of multiplying a reasonable hourly rate by the number of hours *1249 reasonably expended on the litigation. See Ihler v. Chisholm , 2000 MT 37, ¶ 25, 298 Mont. 254, 995 P.2d 439. Under the lodestar method, the reasonable hourly rate is calculated according to the ***164 prevailing market rates in the relevant community. Ihler , ¶ 27. Abbey/Land maintains that the hourly rate awarded to James River should have been reduced to the prevailing market rate in the relevant community. As we have recognized, see Renville , ¶ 31, a district court should consider the factors from Plath v. Schonrock , 2003 MT 21, ¶ 36, 314 Mont. 101, 64 P.3d 984, when determining the amount of attorney fees to award under § 27-8-313, MCA. The District Court considered the Plath factors in detail in its seventeen-page, single-spaced Findings of Fact, Conclusions of Law and Order regarding attorney fees and costs. Its factual findings are supported by the record and are not in clear error. Without recounting those findings in detail, we agree that the record supports the District Court's reasoning. We cannot say that the District Court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason. See Kenyon-Noble Lumber Co. v. Dependant Founds., Inc. , 2018 MT 308, ¶¶ 29-32, 393 Mont. 518, 432 P.3d 133; Ferdig Oil Co. v. ROC Gathering, LLP , 2018 MT 307, ¶¶ 24-30, 393 Mont. 500, 432 P.3d 118. We hold that the District Court did not abuse its discretion in awarding the full hourly rate requested by James River.
¶71 Glacier contends that James River incurred extra fees in the Flathead County case due to tactical decisions made in the Lake County case. It maintains that these additional fees should not be recoverable in the Flathead County litigation. The District Court, however, addressed in detail the hourly rate and number of hours James River's attorneys billed in the Flathead County litigation and found that the rates and hours were reasonable and necessary considering the work involved, the amount at stake, and the factual and legal complexity of the case. We reject Glacier's contentions. First, it is not at all clear that such a fine parsing of fees would be possible with any certainty. Second, a review of the entire record demonstrates the District Court did not abuse its discretion in awarding the fee amount. James River does concede to Glacier that the fee award should be reduced by $16,677.51 for the fees James River withdrew on the record at the hearing.
¶72 "We may uphold a judgment on any basis supported by the record." Rooney v. City of Cut Bank , 2012 MT 149, ¶ 25, 365 Mont. 375, 286 P.3d 241. When "the conclusion of the district court is correct, it is immaterial, for the purpose of affirmance on appeal, what reasons the district court gives for it conclusion. If we reach the same conclusion as the district court, but on different grounds, we may affirm the district court's judgment." Johnson Farms, Inc. v. Halland , 2012 MT 215, ¶ 11, 366 Mont. 299, 291 P.3d 1096 (internal citations omitted). We hold that ***165 an award of attorney fees was proper under § 27-8-313, MCA. We remand to the District Court to decrease the attorney fee award by $16,677.51, as stipulated to by the parties, but otherwise affirm the award.
Costs
¶73 Finally, Abbey/Land contests the District Court's award of costs, because the court awarded costs not recoverable under § 25-10-201, MCA. The District Court determined that it was not constrained by § 25-10-201, MCA, because it awarded costs under its inherent authority, not under any statute. James River maintains that the District Court properly awarded its costs as a sanction against Abbey/Land and Glacier.
¶74 Just as the District Court did not have the inherent authority to award attorney fees as a sanction under these circumstances, neither did the court have inherent authority to award costs. The District Court's authority to award costs under these circumstances must, therefore, derive from a statute. Section 27-8-311, MCA, clearly authorizes a district court to award costs in a declaratory judgment action. No party has argued that § 27-8-311, MCA, or any other statute applicable in this case authorized the District Court to award costs exceeding those authorized under the general cost statute, § 25-10-201, MCA. As such, we hold that it was an abuse of the District Court's discretion to award costs not authorized by § 25-10-201, MCA. See Thayer v. Hicks , 243 Mont. 138, 158, 793 P.2d 784, 796-97 (1990) ("Only *1250 those costs delineated in § 25-10-201, MCA, may be charged to the opposing party unless the item of expense is taken out of § 25-10-201, MCA, by a more specialized statute, by stipulation of the parties, or by rule of court."); Buxbaum , ¶ 31 ("[N]othing in the UDJA or plain language of § 27-8-311, MCA, suggests that we should construe 'costs' in declaratory judgment actions differently than our historical interpretation of that term.").
¶75 We hold that costs properly were awarded to James River, not under the court's inherent authority, but under § 27-8-311, MCA. See Rooney , ¶ 25 ; Johnson Farms, Inc. , ¶ 11. We remand for the District Court to recalculate its cost award based on costs allowable under § 25-10-201, MCA.
CONCLUSION
¶76 The District Court's findings that the confessed judgment was unreasonable and the product of collusion are affirmed. The District Court's amended judgment is reversed and remanded with instructions to dismiss Abbey/Land's claims against Glacier with prejudice. The ***166 District Court's decision to grant attorney fees is affirmed. The attorney fee award is reversed and remanded to reduce the fee award by $16,677.51, but the award amount otherwise is affirmed. The District Court's decision to award costs is affirmed. The award amount is reversed and remanded for the District Court to recalculate the award, including only costs allowable under § 25-19-201, MCA.
We Concur:
MIKE McGRATH, C.J.
LAURIE McKINNON, J.
DIRK M. SANDEFUR, J.
JAMES JEREMIAH SHEA, J.

The Charter Oak Fire Insurance Company, Travelers Property Casualty Company of America, The Travelers Indemnity Company, and Continental Western Insurance Company provided a defense to Glacier under reservation until May 7, 2013, when a federal district court in Oregon found that those companies had no duty to defend Glacier because Glacier had violated its duty to cooperate by engaging in "brazen collusion" with Abbey/Land. Charter Oak Fire Ins. Co. v. Interstate Mech., Inc. , 958 F.Supp.2d 1188, 1205 (D. Or. 2013).

A declaratory judgment action against James River and other insurance companies regarding coverage is currently ongoing in Lake County. Glacier Constr. Partners, LLC v. Interstate Mech., Inc. , No. DV-11-276 (Mont. 20th Judicial Dist., Lake Cty.). Whether James River breached a duty to defend is not at issue in this case. Abbey/Land LLC I , ¶ 15.

A second contingency fee agreement executed on May 6, 2013, increased Cushman's contingency fee to fifty percent.

This e-mail was sent just a week after Cushman wrote to Abbey that Abbey/Land had done nothing to substantiate its claims.

The District Court also disqualified Best and Cushman from further representing either Abbey/Land or Glacier in the Flathead litigation.

Wash. Rev. Code § 4.22.060 (2018) provides that courts in Washington must hold a reasonableness hearing for all settlement agreements and that the burden of proof regarding reasonableness of the settlement offer shall be on the party requesting the settlement. It also provides a determination that the settlement offer is unreasonable does not affect the validity of the agreement between the parties.

Given our determination that dismissal is the only proper remedy under the circumstances of this case, we do not address whether, after determining that the parties' stipulated settlement amount is unreasonable, a district court may enter judgment for an amount lower than the parties agreed to in their stipulated settlement.